## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:  WM DISTRIBUTION, INC.,                              No. 17-10535-j11

       Debtor.

## **<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on cross-motions for summary judgment[1] on Susan Jesmer d/b/a Native Trading Associates ("Jesmer")'s claim set forth in her proof of claim (Claim No. 2) and the Debtor's objection to the claim.[2]  Primarily at issue is whether a provision in a promissory note constitutes an enforceable liquidated damages provision or an unenforceable penalty. The original principal amount of the promissory note made by WM Distribution, Inc. ("WM") and Sandia Tobacco Manufacturers, Inc. ("STM") in favor of Jesmer is $1,300,000. The provision of the promissory note in question requires payment of an additional $600,000 upon the occurrence of certain events of default.

Based on the facts not in genuine dispute, the Court concludes that WM and STM are entitled to summary judgment as a matter of law with respect to the $600,000 additional amount. Summary judgment will be denied with respect to the fees and expenses components of Jesmer's claim because facts are in genuine dispute.

---

[1] *See* Debtor's Motion for Summary Judgment – Docket No. 156; Motion for Summary Judgment on Sandia Tobacco Manufacturers, Inc.'s Objection to Proof of Claim of Susan Jesmer (Claim 2) ("STM's Motion for Summary Judgment") – Docket No. 180; Susan Jesmer d/b/a Native Trading Associates' Motion for Summary Judgment on Objections to her Claims by Debtor and Sandia Tobacco Manufacturers ("Jesmer's Motion for Summary Judgment") – Docket No. 183.  The parties also filed the following responses: 1) Response of Susan Jesmer d/b/a Native Trading Associates to Debtor's Motion for Summary Judgment ("Jesmer's Response to WM") – Docket No. 182; Response of Susan Jesmer d/b/a Native Trading Associates to Motion for Summary Judgment on Sandia Tobacco Manufacturer's, Inc.'s Objection to Proof of Claim of Susan Jesmer (Claim 2) ("Jesmer's Response to STM") – Docket No. 203; Response in Opposition to Susan Jesmer d/b/a Native Trading Associates' Motion for Summary Judgment on Objections to her Claims by Debtor and Sandia Tobacco Manufacturers ("STM Response") – Docket No. 201.
[2] *See* Docket No. 82.

## SUMMARY JUDGMENT STANDARDS

Summary judgment can streamline litigation and avoid the unnecessary expense of proceeding to trial. *See Farnell v. Albuquerque Publ'g Co.*, 589 F.2d 497, 502 (10th Cir. 1978) ("[S]ummary judgment is a useful tool which may avoid needless trials.") (citation omitted); *Mitchell v. Zia Park, LLC*, 842 F.Supp.2d 1316, 1321 (D.N.M. 2012) ("Principal purposes of summary judgment include streamlining litigation and saving needless time and expense by isolating and disposing of purely legal issues and factually unsupported claims and defenses.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986) (remaining citation omitted)). The Court will grant summary judgment when the movant demonstrates that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), made applicable to adversary proceedings by Fed. R. Bankr. P. 7056. "[A] party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion, and . . . [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, the Court must "'examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Wolf v. Prudential Ins. Co. of America*, 50 F.3d 793, 796 (10th Cir. 1995) (quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990)). The party opposing summary judgment "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)). To resist a properly supported motion for summary judgment, the opposing party may not rely on the allegations in the

complaint or the denials contained in the answer, "but must set forth specific facts showing that there is a genuine issue for trial" through affidavits or other supporting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L Ed.2d 202 (1986) (citation and internal quotation marks omitted).

When there are cross-motions for summary judgment, the Court is "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment nevertheless is inappropriate if disputes remain as to material facts." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (additional quotation marks and citation omitted). The Court must evaluate each motion for summary judgment individually. *See United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906-07 (10th Cir. 2016) ("Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor.") (quoting *Manganella v. Evanston Ins. Co.*, 702 F.3d 68, 72 (1st Cir. 2012) (additional internal quotation marks and citation omitted)); *see also, Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of the other.") (citations omitted).

### FACTS NOT SUBJECT TO MATERIAL DISPUTE

1. WM and Susan Jesmer are business competitors. *See* Debtor's Motion for Summary Judgment, ¶ 1; Jesmer's Response to WM (disputing, in part, WM's undisputed facts numbered 3, 4, 5, 7, 9 and 10, 11 and 12 only).

2. Jesmer filed a complaint against WM and STM in the Seventh Judicial District Court, Torrance County, New Mexico (the "State Court Action"). *See* Affidavit of Donna Woody

("Woody Affidavit") (Docket No. 156-1); Settlement Agreement and Mutual Release ("Settlement Agreement") referenced as an exhibit to the Woody Affidavit and filed under seal as Docket No. 169.[3]

3. Jesmer asserted claims against WM and STM in the State Court Action in excess of $5 million. Affidavit of Donna Woody (Docket No. 156-1).[4]

4. WM and STM asserted cross-claims against Jesmer in the State Court Action. *See* Settlement Agreement.

5. To settle the State Court Action, WM, STM, Jesmer and others entered into a Settlement Agreement dated April 11, 2011. *See* Settlement Agreement.

6. Under the Settlement Agreement, WM and STM agreed to pay Jesmer "the sum of $1,300,000," defined in the Settlement Agreement as "the Indebtedness." *See* Settlement Agreement, ¶1.

7. In a paragraph entitled "Payment Terms" the Settlement Agreement provides: "The Indebtedness, and the terms of payment shall be set forth in a Promissory Note, which is attached hereto as Exhibit A and incorporated herein by reference." *Id.* at ¶2.

8. The Settlement Agreement includes a provision entitled "Entire Agreement," which provides, in its entirety:

---

[3] The Settlement Agreement was filed under seal because of a confidentiality provision in the agreement. In an adversary proceeding filed in connection with STM's bankruptcy case, STM has alleged that Jesmer violated the confidentiality provision in the Settlement Agreement. *See* Adversary Proceeding No. 17-1088. Jesmer filed a counterclaim asserting that STM violated the confidentiality provision of the Settlement Agreement. *Id.* – Docket No. 8. At a pretrial conference held in Adversary Proceeding No. 17-1088, counsel for STM, Jesmer, and WM agreed that the Court may discuss the terms of the Settlement Agreement in this Memorandum Opinion without the need for redaction.

[4] Jesmer "estimated" that her recovery in the State Court Action would have been $1.8 million in actual damages, and her total recovery would have been $6 million, absent a settlement. *See* Affidavit of Bryan Haynes, attached to Jesmer's Motion for Summary Judgment as Exhibit 1. WM disputes this statement of undisputed material fact on hearsay grounds, arguing that the affidavit fails to identify who made the estimation. WM concedes that Jesmer asserted claims against WM and Sandia Tobacco in the State Court Action in excess of $5 million.

This Agreement, the Promissory Note and the Security Agreement attached hereto embody the entire agreement of the Parties relative to the subject matter thereof. In the event of a conflict between the terms of this Agreement and the terms of the Promissory Note and the Security Agreement, the terms of the Promissory Note and the Security Agreement shall control. There are no promises, terms, conditions or obligations other than those contained herein. This Agreement supersedes all previous communications, representations or agreements, either written or verbal, between the parties relative to the subject matter of this Agreement. This Agreement may be modified only in a writing executed by the Parties.

Settlement Agreement, ¶ 16.

9. On April 11, 2011, WM and STM executed a Promissory Note payable to Jesmer in the original principal amount of $1.3 million (the "Promissory Note" or "Note"). *See* Promissory Note, attached as Exhibit 1B to the Debtor's Motion for Summary Judgment; Promissory Note attached as part of Exhibit 2 to Jesmer's Motion for Summary Judgment.

10. WM and STM are the makers under the Note and Jesmer is the payee. *See* Promissory Note, opening unnumbered paragraph.

11. The Promissory Note defined "Indebtedness" as "the principal sum of $1.3 million plus interest," and required payments on the following schedule:

> April 11, 2011 – payment of $180,000
> May 2011 through January 2013 – monthly payments of $12,000
> February 2013 through January 2016 – monthly payments of $18,500
> February 2016 until the Indebtedness is paid in full – monthly payments of $25,000

*See* Promissory Note, Opening unnumbered paragraph, and ¶ 2,

12. The Promissory Note imposed a late charge of 5% of the amount due on all payments described in paragraph 9 above (paragraph 2 of the Note) not made within seven days after the due date. *See* Promissory Note, ¶ 3.

13. The Promissory Note granted WM and STM "the right to prepay the principal amounts owned hereunder, without penalty." *See* Promissory Note, ¶ 5.

14. The Promissory Note contains seven defined events of default, including the following:

(a) breach by any of the Makers of any covenant, representation, agreement, or undertaking under this Promissory Note;

(b) the Makers shall fail to make any payment when such payment is due hereunder and within the cure period therefor, whether at the stated maturity hereof, by acceleration or otherwise;

(c) the dissolution or liquidation of either of the Makers, or any action taken under any federal or state law for the adjustment or reorganization of either of the Makers' financial affairs without the consent of the Holder, or the entry of any order seeking the reorganization, liquidation, adjustment, or arrangement of either of the Makers under any state or federal law, or the appointment of a receiver for any part of either of the Makers' property;

(d) the inability of either of the Makers to pay debts as they fall due, or in the usual course of business;

Promissory Note, ¶ 9(a), (b), (c) and (d).

15. The Promissory Note provides that upon the occurrence of a default under either paragraph 9(c) or paragraph 9(d) of the Note, "the Makers shall be indebted to the Holder in the additional amount of $600,000.00, in addition to the outstanding balance of this Promissory Note." Promissory Note, ¶ 9.

16. The Promissory Note provides that its terms "may be modified only in a writing executed by the Makers and the Holder." Promissory Note, ¶ 17.

17. The obligation on the part of WM and STM to pay an additional amount of $600,000 in the event certain defaults occur, set forth in paragraph 9 of the Promissory Note, is nowhere stated in the Settlement Agreement except to the extent the Settlement Agreement incorporated by reference the terms of the promissory note attached as Exhibit A to the Settlement Agreement.[5] *See* Promissory Note, ¶ 2 ("The Indebtedness, and terms of payment, shall be set

---

[5] Although the Settlement Agreement references the Promissory Note, attached as Exhibit A to the Settlement

forth in a Promissory Note, which is attached hereto as Exhibit A and incorporated herein by reference.").

18. The Promissory Note includes this attorneys' fees provision:

> The Makers hereby agree to pay all costs of collection, including reasonable costs and attorneys' fees, if after the occurrence of an Event of Default . . . this Promissory Note is placed in the hands of an attorney or a collection agency, or if, after the occurrence of an Event of Default the Holder finds it necessary or desirable to secure the services or advice of an attorney with regard to collection.

Promissory Note, ¶ 8.

19. The Promissory Note provides that any "delay or omission" by Jesmer in "exercising any right" under the Promissory Note does not "operate as a waiver of such right or any other right." Promissory Note, ¶ 20.

20. Until the Promissory Note was paid in full, WM and STM were required to provide quarterly financial statements and income tax returns to Shawn M. Stack, an accountant, for the purposes of assessing whether a default has occurred under the Promissory Note. *See* Promissory Note, ¶ 11.

21. The Promissory Note contains this choice of law provision: "This Promissory Note shall be governed and construed in accordance with the laws of New Mexico." *See* Promissory Note, ¶ 16.

---

Agreement, the Settlement Agreement presented to the Court in support of Debtor's Motion for Summary Judgment does not have a copy of the Promissory Note attached as Exhibit A. *See* Docket No. 169. The copies of the Promissory Note and Security Agreement attached as Exhibit H to STM's Motion for Summary Judgment reflect "Exhibit A" and "Exhibit B" on the top of the respective documents. *See* Docket No. 180-4. The copies of the Promissory Note and the Security Agreement attached as Exhibit 2 to Jesmer's Motion for Summary Judgment reflect the same headers. *See* Docket No. 183-3. The copies of the Promissory Note and the Security Agreement attached as exhibits to the Debtor's Motion for Summary Judgment and to Jesmer's Motion for Summary Judgment are signed. The Court cannot discern from the documents presented on summary judgment whether the copies of the Promissory Note and Security Agreement are in the same form as those originally attached to the Settlement Agreement.

-7-

22. WM and STM executed a Security Agreement (the "Security Agreement") to secure payment of the Promissory Note. *See* Security Agreement attached as Exhibit 1C to Debtor's Motion for Summary Judgment; Security Agreement attached as part of Exhibit 2 to Jesmer's Motion for Summary Judgment.

23. Under the Security Agreement, WM and STM granted Jesmer a security interest in certain collateral to secure payment of the original principal sum of $1.3 million and all other obligations of WM and STM under the Promissory Note and agreed to keep the collateral insured in an amount not less than $1.3 million. *See* Security Agreement.

24. WM and STM failed to provide financial reporting to Mr. Stack, which constituted a default under paragraphs 9(a) and 11 of the Promissory Note. *See* Jesmer's Motion for Summary Judgment, ¶ 28; STM Response (disputing Jesmer's fact Nos. 3, 4, 22, 29, and 41 only, but not fact No. 28).

25. Beginning in January of 2016, counsel for WM, STM, and Jesmer began negotiating a change in the payment amounts due under the Promissory Note. *See* Jesmer's Motion for Summary Judgment, ¶ 31; STM Response – not contesting this statement of undisputed material fact.

26. In February of 2016, WM and/or STM sold property subject to the Security Agreement and paid Jesmer $190,000 from the proceeds of the sale. *See* STM's Motion for Summary Judgment, ¶ 12; Jesmer's Response to STM – not contesting this statement of undisputed material fact.

27. Also beginning in February of 2016, WM began making monthly payments to Jesmer in the amount of $14,918.58 (instead of $18,500 as provided in the Promissory Note). *See* Jesmer's Motion for Summary Judgment, ¶ 34; Debtor's Motion for Summary Judgment, ¶ 13.

28.  The parties never signed a written agreement regarding the reduced payment amounts.  *See* Jesmer's Motion for Summary Judgment, ¶ 35; STM Response – not contesting this statement of undisputed material fact.

29.  In September of 2016, WM and/or STM sold additional collateral subject to the Security Agreement, and paid $100,000 from the proceeds of the sale to Jesmer.  *See* STM's Motion for Summary Judgment, ¶ 17; Jesmer's Response to STM – not contesting this statement of undisputed material fact.

30.  STM filed a voluntary petition under Chapter 11 of the Bankruptcy Code on September 19, 2016.  Debtor's Motion for Summary Judgment, ¶ 4; Jesmer's Response to WM, UMF 4 (disputing only WM's request for the Court to take judicial notice of statements contained within filings).

31. WM filed a voluntary petition under Chapter 11 of the Bankruptcy Code on March 9, 2017. *Id*

32.  In July of 2017, WM and STM sold a cigarette packing machine subject to the Security Agreement, and paid $31,779 from the proceeds of the sale to Jesmer.  *See* Woody Affidavit, ¶ 17.

33. WM and STM have made payments to Jesmer both before and during the WM and STM bankruptcy cases, which paid in full the original principal balance of $1.3 million plus the interest due under the Promissory Note.  *See* Debtor's Motion for Summary Judgment, ¶ 7; Jesmer's Response to WM (restating Jesmer's total interrogatory response: "During the course of the bankruptcies initiated by Sandia Tobacco [and] Debtor, the principal balance and regular interest due on the Note were paid in full.  However, paragraph 9 of the Note was triggered both by Sandia and WM's defaults resulting in an additional $600,000 due from Debtor.").

34.  Jesmer filed a proof of claim in the amount of $84,466.00 in the STM bankruptcy case ("Jesmer's STM Claim"). *See* Case No. 16-12335-j11 – Claim No. 12-1.

35.  Jesmer filed proof of claim in the amount of $725,994.73 in the WM bankruptcy case ("Jesmer's WM Claim"). *See* Claims Register, Claim No 2-2 (Amended Claim).

36.  Jesmer's WM Claim consists of the following:

| | |
|---|---:|
| Legal fees | $68,582.98 |
| Balance due on promissory note | $55,573.75 |
| "Kicker upon default" | $600,000 |
| Deposition travel expenses | $1,838.00 |
| TOTAL: | $725,994.73 |

Claim No. 2-2.

37. The basis for the Jesmer's WM Claim is the Promissory Note, the Security Agreement, and a UCC-1 Financing Statement. *Id.*

38. Jesmer's WM Claim includes a claim for legal fees from September 2016 through March 9, 2017 in the amount of $68,582.98. *Id.*

39.  Jesmer's STM claim, including her claim for attorneys' fees incurred in STM's bankruptcy case, has been satisfied. *See* Sandia Tobacco, Case No. 16-12335-j11 – Docket Nos. 208 and 243.

DISCUSSION

The cross motions for summary judgment address two issues: first, whether Jesmer is entitled to the additional $600,000 owed under the terms of the Promissory Note upon the occurrence of certain events of default; and second, whether Jesmer is entitled to attorneys' fees under the Note. It is undisputed that the principal balance of $1.3 million, plus the regular interest payments due on the principal under the Note, are now paid in full. *See* Facts Not Subject to Material Dispute, ¶ 33, *supra.* The Court will address Jesmer's claim to the $600,000

-10-

first and then will discuss the attorney fee claim.

    A.  <u>Whether the $600,000 obligation under the Note is enforceable because it represents a discount in the amount WTM and STM would have owed Jesmer if no settlement had been reached.</u>

WM and STM reached an agreement with Jesmer that settled litigation among the parties. Pursuant to the Settlement Agreement, WM and STM executed a Promissory Note in the original principal amount of $1.3 million. The Note provides that WM and STM have an obligation to pay an additional $600,000 upon the occurrence of one or more of two defined events of default: 1) the dissolution, liquidation, or reorganization of either WM or STM (*i.e.,* a bankruptcy filing)[6] or, the appointment of a receiver; or 2) the inability of WM or STM to pay debts when they become due, or in the ordinary course of business. *See* Promissory Note, ¶¶ 9(c) and (d).

Jesmer argues that the $600,000 provision is an enforceable term included in the Note as part of a vigorously negotiated settlement. She characterizes the $600,000 as a discount of the amount she sought and reasonably believed she would have been awarded in the State Court Action. She maintains that she was poised to recover actual damages of $1.8 million against WM and STM, which could have trebled or increased by an award of punitive damages, interest, attorneys' fees, and costs. When viewed this way, Jesmer argues the $600,000 is not a penalty but a negotiated compromise as part of a settlement to which WM and STM agreed in exchange for Jesmer agreeing to accept $1.3 million in satisfaction of her $6 million claim ($500,000 less

---

[6]An *ipso facto* clause that treats the debtor's filing of a bankruptcy case as a default is often unenforceable in a bankruptcy case. *See In re Hutchins*, 99 B.R. 56, 57 (Bankr. D. Colo. 1989) ("Bankruptcy default clauses are not favored and are generally unenforceable under the Bankruptcy Code."); *In re Holling*, 2007 WL 2964505, at *5 (Bankr. D. Utah Feb. 8, 2007) ("Section 365(e)(1) of the Code is consistently used to defeat termination-upon-bankruptcy clauses and other *ipso facto* clauses in contracts . . ."); *see also,* 11 U.S.C. § 541(c) (a debtor's interest in property is included as property of the bankruptcy estate notwithstanding a provision that grants rights in the property to a lender based on the debtor's insolvency or bankruptcy filing). To side step this issue, Jesmer bases her claim that WM defaulted under paragraph 9(b) of the Promissory Note on *STM's* prior bankruptcy filing, not WM's bankruptcy filing. Because the Court concludes that the $600,000 is an unenforceable penalty, the Court need not consider whether STM's bankruptcy filing is an enforceable event of default of WM's obligations under the Promissory Note.

than her claimed actual damages). Jesmer maintains that she accepted $1.3 million to settle her $6 million claim, instead of insisting on a larger amount, only on the condition that STM and WM would pay the $1.3 million before certain events of default occurred. When viewed in this manner, Jesmer argues, the $600,000 represents reasonable liquated damages.

The Court disagrees with the notion that the reasonableness of the $600,000 provision should be considered based on the likely outcome of the State Court Action in which Jesmer asserted claims totaling $6 million. Jesmer agreed to settle the State Court Action for $1.3 million. That figure fixed the value of the claims in the State Court Action for settlement purposes. The Court concludes that Jesmer's requested damages asserted in the State Court Action, and her likelihood of success in that litigation, is irrelevant to whether the $600,000 provision is enforceable. The $600,000 does not represent a discount from Jesmer's likely litigation recovery given in settlement, as Jesmer maintains, but instead represents liquidated damages that are in addition to the agreed settlement amount, triggered upon the occurrence of certain defaults.

The settlement documents belie Jesmer's characterization of the $600,000 as a "discount." The Settlement Agreement provides that the settlement is without any admission of liability by any party and represents a compromise for the purpose of avoiding further controversy, litigation and expense. The Settlement Agreement provides that WM and STM shall pay Jesmer $1.3 million. It does not provide for a settlement in the amount of $1.9 million with a $600,000 discount if payment is made prior to default. The Settlement Agreement defines "Indebtedness" to include the $1.3 million, but not the $600,000. There is no reference in the Settlement Agreement to the $600,000 additional amount except as may have been set forth in the form of promissory note attached as an exhibit to the Settlement Agreement and incorporated

-12-

by reference into the Settlement Agreement. The Settlement Agreement characterizes that form of Promissory Note as stating the terms of payment of the $1.3 million indebtedness under the Settlement Agreement.  Further, nothing in the Settlement Agreement suggests that the $600,000 provision in the Note was included in exchange for Jesmer not insisting on a higher settlement amount, or was given in exchange for Jesmer discounting the original principal balance of the Note.  Further, consistent with the settlement amount of $1.3 million stated in the Settlement Agreement, the Security Agreement requires WM and STM to obtain insurance in the amount of $1.3 million to insure the collateral pledged to secure the Note.

Likewise, the Promissory Note, does not suggest that the additional $600,000 was included in exchange for a discount to the original principal of $1.3 million. To the contrary, the Note characterizes the additional $600,000 as agreed upon damages for which WM and STM will be liable upon the occurrence of either of two events of default: 1) the dissolution, liquidation, or reorganization of either WM or STM, or the appointment of a receiver; or 2) the inability of WM or STM to pay debts when they become due, or in the ordinary course of business. Note, ¶¶ 9(c) and (d).

Jesmer asserts that she was confident she would be awarded actual damages of $1.8 million against WM and STM in the State Court Action if she did not settle, and estimated the value of her claims to be $6 million, including her claims for treble and punitive damages. She points to this as support for the $1.3 million settlement amount being a discount from her valid $1.8 million actual damages claim and an even larger discount from her total claim.  However, WM and STM disputed the claims and asserted counterclaims in the State Court Action. The fact that Jesmer settled for $1.3 million, which was far less than the $6 million she claimed, does not by itself suggest that the $600,000 additional amount was a discount given in settlement that was

conditioned on payment of $1.3 million prior to occurrence of an event of default of the type that triggered a $600,000 default remedy.

Jesmer has offered numerous emails between counsel who negotiated the Settlement Agreement regarding the $600,000 payment provision in the Promissory Note in support of her position that it reflects a negotiated discount of the amount she was likely to recover as damages in the pending litigation. The emails are inadmissible if offered for this purpose and therefore will not be considered by the Court.  The "Entire Agreement" clause of the Settlement Agreement provides that the agreement constitutes the entire agreement of the parties relative to the subject matter of the agreement, and that the agreement supersedes all previous communications, representations or agreements between the parties relative to the subject matter of the agreement. The emails upon which Jesmer relies would be inconsistent with the terms of the Settlement Agreement if they suggested that the $600,000 was intended as a discount. However, even if the emails were admissible, they fail to raise a genuine issue of material fact that could establish: 1) the $600,000 was a discount; or 2) WM or STM agreed they were liable to Jesmer in any amount prior to the parties reaching the settlement. At most, the emails show that the parties vigorously negotiated the agreement.

Jesmer relies on *Nippon Credit Bank, Ltd. v. Matthews*, 291 F.3d 738 (11th Cir. 2002) (per curium) abrogated on other grounds by *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010) and *In re Premier Golf Properties, LP*, 564 B.R. 660 (Bankr. S.D. Cal. 2016) in support of her argument that the provision in the Promissory Note imposing an additional $600,000 liability on the part of WM and STM in the event of default is enforceable because the settlement amount represents a discount from the amount Jesmer would have recovered in the State Court Action if the parties had not settled. The Court will examine

-14-

these and other similar cases below. All are distinguishable.

In *Nippon,* the parties settled litigation in which Nippon had asserted claims for $80 million. *Nippon*, 291 F.3d at 751. Under the settlement, the defendant agreed to pay Nippon $8 million. *Id.* The parties' settlement agreement included a discount whereby Nippon would accept $4 million in full satisfaction of the $8 million if that amount was paid within a prescribed period. *Id.* Failure to pay the $4 million within that period would result in enforcement of the obligation to pay the entire $8 million. *Id.* The defendant failed to pay the $4 million within the prescribed period, and Nippon obtained an $8 million judgment which it sought to enforce. *Id.* The *Nippon* court enforced the $8 million judgment, reasoning in part that such amount "was based on a settlement agreement which substantially reduced the amount sought in the underlying litigation." *Nippon,* 291 F.3d at 751.

In *Premier Golf Properties*, the debtor admitted in the settlement agreement that it contractually owed Premier Golf the entire principal balance of $15,379,362.49. *Premier Golf,* 564 B.R. at 669. The settlement agreement provided further that debtor would pay a lump sum payment of $8.5 million, and that the total indebtedness would remain due until payment of the lump sum payment by a stated deadline. *Id.* at 669-70. The *Premier* court characterized the potential reduction in payment under the settlement agreement as a "conditional discount provision." *Id.* at 693. Debtor did not pay the $8.5 million by the deadline, and breached the settlement agreement a second time by failing to timely pay delinquent property taxes. *Id.* at 685. In applying California law, the *Premier* court concluded that requiring debtor to pay an additional $6.8 million (the difference between the total indebtedness of $15,379,362.49 and the $8.5 million) did not constitute an unenforceable penalty. *Id.* at 693. Debtor admitted that it owed the total amount of the indebtedness, which was always its contractual obligation to pay.

-15-

*Id.* Thus the settlement for $15,379,362.49 with a conditional discount of $6.8 million if the debtor paid a lump sum of $8.5 million by the stated deadline and prior to any other defaults was enforceable.

In *Scavenger Sale Investors, L.P. v. Bryant*, 288 F.3d 309 (7th Cir. 2002)*,* another case with similar facts, the Seventh Circuit upheld a settlement that provided a discount if the defendant made a prompt payment of the discounted amount. Plaintiff filed suit against defendant seeking to collect under a loan agreement. *Id.* at 310. The parties agreed that plaintiff had a valid claim against defendant for $1.6 million and that the district court could enter a judgment for that amount, plus interest, unless the defendant promptly paid $1 million plus interest under a formula contained in the parties' settlement agreement. *Id.* When defendant failed to pay the $1 million to earn the discount, plaintiff obtained a judgment for $1.6 million. *Id.* The Seventh Circuit viewed the agreement as a confirmation of what defendant owed plaintiff under the loan agreement ($1.6 million), with a $600,000 discount for prompt payment. *Id.* at 311. It reasoned that "[i]n settlement cases we ask whether the full payment provided in the event the settlement falls through reasonably approximates the damages that the court was likely to provide had the case been litigated to conclusion." *Id.* at 312. "[T]he outcome of litigation is the lawful benchmark" for determining whether the amount is a penalty. *Id.* Because the settlement figure of $1.6 million was less than the likely judgment after trial, the $1.6 million judgment did not include an unenforceable penalty. *Id.*[7]

---

[7] *Medstrategies Consulting Group, Ltd. v. Schmiege*, 888 N.E.2d 667 (Ill. Ct. App. 2008) involved a settlement more similar to the agreement among Jesmer, WM and STM. In that case, the parties settled pending litigation for $25,000, payable in monthly instalments. *Medstrategies,* 888 N.E.2d at 668. If the obligor failed to timely cure a payment default, the amount due under the settlement would increase by $54,000 to $79,000. *Id.* When defendant failed to cure a default in the monthly payments due under the settlement, plaintiff obtained a judgment against the defendant in the amount of $79,000. *Id.* On appeal, defendant contended that the $79,000 was excessive and unreasonable because it was more than three times the settlement amount, and was disproportionate to the damages plaintiff suffered due to defendant's late payment. *Id.* at 670. Plaintiff countered that the $25,000 represented a discount of the actual amount owed, reasoning that plaintiff would have received at least $79,000 if the parties had

-16-

By contrast, WM and STM settled with Jesmer for $1.3 million not $1.9 million, without any admission of liability in any amount. The $600,000 is not a discount from the settlement amount but instead is additional damages owed under a default remedy in the Note triggered by the occurrence of certain events of default. No judgment was entered as part of the Settlement Agreement for $1.9 million with a $600,000 discount upon payment of $1.3 million within a specified time. Nor was a discount given from the agreed settlement amount in exchange for payment faster than what the settlement agreement required.

The settlement amount of $1.3 million to which Jesmer, WM and STM agreed as a compromise was the agreed value of Jesmer's claims for purposes of settling the State Court Action. Jesmer's own disputed estimation of the value of her claims in the State Court Action, including her disputed actual damages claim of $1.8 million and her disputed $6 million damages claim based on treble or punitive damages, is not the benchmark for the reasonableness of the $600,000 default damages provision. Where, as here, the parties settle disputed claims for a stated amount without any admission of liability, and the provision at issue awards liquidated damages in addition to the settlement amount on default, it is unnecessary to require the parties to present evidence of the likely outcome of the very litigation they chose to settle to determine the enforceability of the liquidated damages provision. Absent an issue about whether the Settlement Agreement was supported by adequate consideration, the likely outcome of the State Court Action had no settlement been reached is irrelevant to the reasonableness of the $600,000 as an additional liability triggered upon the occurrence of defined events of default.

---

completed their litigation. *Id.* The Court determined that the $79,000 represented an unenforceable penalty because there was no evidence that plaintiff would have received $79,000 had the parties not settled the litigation. *Id.* at 671. To the extent *Medstrategies* suggests that a mini-trial on the probable outcome of the underlying litigation is relevant to determine the enforceability of a liquidated damages provision contained in a settlement agreement triggered by nonpayment of the settlement amount, this Court disagrees.

-17-

The parties could have agreed to a settlement in the amount of $1.9 million, with a $600,000 discount if WM and STM paid $1.3 million to Jesmer within a certain time or prior to WM and STM breaching any obligations under the Promissory Note. But that was not the agreement of the parties.

B. Whether the additional $600,000 obligation under the Note is so extravagant or disproportionate to the likely damages resulting from a breach as to constitute an unenforceable penalty

Jesmer also contends, in the alternative, that the $600,000 liquidated damages provision in the Promissory Note is not a penalty but instead is a reasonable estimate of damages to: 1) guard against WM and STM's non-performance under the Promissory Note; 2) liquidate by agreement Jesmer's anticipated attorney's fees in the event of default; and 3) compensate Jesmer for the difficulty, costs and risks she might face in collecting the Note. The Court disagrees.

Liquidated damages are damages in an amount stated in a contract that are triggered upon occurrence of specified events of default that constitutes a breach of the contract. *See Fort Knox Self Storage, Inc. v. Western Technologies, Inc.*, 2006-NMCA-096, ¶26, 140 N.M. 233, 240, 142 P.3d 1, 8 (Ct. App. 2006) ("A liquidated damages clause 'applies when the parties to a contract have agreed in advance on the measure of damages to be assessed in the event of default.'") (quoting *A Dictionary of Modern Legal Usage* 530 (2d Ed. 1995)). The Note provides that the makers, WM and STM, owe an additional $600,000 upon the occurrence of specified events of default that constitute a breach of the Note. Therefore, the provision imposing $600,000 of damages upon default is a liquidated damages provision.

Whether a contract provision such as the $600,000 additional payment obligation in the Note is an enforceable liquidated damages clause or an unenforceable penalty is a question of law. *See In re Market Center East Retail Property, Inc.*, 433 B.R. 335, 360 (Bankr. D.N.M. 2010) ("[W]hether a contract provision is a valid liquidated damages clause or a penalty is a

-18-

legal question for the court.") (citation omitted); *see also Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001) ("Whether a provision is a penalty clause is an issue of law . . .") (citation omitted). The Promissory Note is governed by the laws of the State of New Mexico. *See* Promissory Note, ¶ 16 ("This Promissory Note shall be governed and construed in accordance with the laws of New Mexico.").[8]

In evaluating a liquidated damages provision, the New Mexico Supreme Court has opined:

> There would seem to be no sound reason why persons competent and free to contract may not agree on the amount of liquidated damages for failure to complete a contract within a specified time to the same extent as they may contract on any other subject, or why their agreement in this respect, when fairly and understandingly entered into, with a view to just compensation for an anticipated loss, should not be enforced. As a general rule, enforcement of such a clause will only be denied when the stipulated amount is so extravagant or disproportionate as to show fraud, mistake or oppression. The standard, however, is not furnished by plaintiff's actual loss or injury, but by the loss or injury which might reasonably have been anticipated at the time the contract was made.

*Gruschus v. C. R. Davis Contracting Co.*, 1965-NMSC-099, ¶ 14, 75 N.M. 649, 655, 409 P.2d 500, 504 (1965) (citations omitted). Under this standard, a liquidated damages provision will be enforced unless the party opposing enforcement can establish that the agreed upon damages amount "is so extravagant or disproportionate" that it shows "fraud, mistake or oppression." *Id.*

Applying a similar standard, the New Mexico Court of Appeals subsequently held:

> A penalty is a term fixing unreasonably large liquidated damages and is ordinarily unenforceable on grounds of public policy because it goes beyond compensation into punishment. *See* Restatement [(Second) of Contracts] § 356 (1) and cmt. a;

---

[8] STM recognizes that WM is a Delaware corporation and Jesmer is a resident of New York, but argues that New Mexico law should apply even if the choice of law provision may not be applicable. *See* STM's Motion for Summary Judgment, p. 9. Jesmer does not contest the applicability of New Mexico law. The Court notes that WM and STM both sought bankruptcy relief in the District of New Mexico. That fact, together with the choice of law provision in the Note, makes it appropriate to apply New Mexico law.

-19-

[(1981)]; 5 Corbin [*Corbin on Contracts* (1964)] § 1057 at 334.

*Nearburg v. Yates Petroleum Corp.*, 1997-NMCA-069, ¶ 10, 123 N.M. 526, 532, 943 P.2d 560,

566 (Ct. App. 1997). The Restatement section cited in *Nearburg* provides:

> Damages for breach by either party may be liquidated in the agreement but only at
> an amount that is reasonable in the light of the anticipated or actual loss caused by
> the breach and the difficulties of proof of loss. A term fixing unreasonably large
> liquidated damages is unenforceable on grounds of public policy as a penalty.

Restatement (Second) of Contracts § 356 (1) (1981).[9]

In applying a standard similar to the standard applied in *Gruschus,* the Federal Circuit has

elaborated:

> When damages are uncertain or difficult to measure, a liquidated damages clause
> will be enforced as long as the amount stipulated for is not so extravagant, or
> disproportionate to the amount of property loss, as to show that compensation was
> not the object aimed at or as to imply fraud, mistake, circumvention or oppression.
> With that narrow exception, there is no sound reason why persons competent and
> free to contract may not agree upon this subject as fully as upon any other, or why
> their agreement, when fairly and understandingly entered into with a view to just
> compensation for the anticipated loss, should not be enforced. The test is objective,
> and regardless of how the liquidated damage figure was arrived at, the liquidated
> damages clause will be enforced if the amount stipulated is reasonable for the
> particular agreement at the time it is made.

*K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1008 (Fed. Cir. 2015) (citations and

internal quotation marks omitted).

The *Gruschus* standard can be harmonized with the *Nearburg* standard by treating an

unreasonably large liquidated damages provision as a form of "oppression." In other words,

when a liquidated damages provision is so extravagant or disproportionate that it functions as

---

[9] In *Market Center* the New Mexico bankruptcy court suggested that New Mexico would frame the test for
determining the enforceability of a liquidated damages provision by asking the following: "1) was the anticipated
injury difficult or incapable of accurate estimation at the time the contract was made? 2) are the stipulated damages
extravagant or disproportionate to the injury anticipated from a breach at the time the contract was made? and 3)
were the agreed upon stipulated damages designed to punish, or have the effect of punishing a party of breaching the
contract or merely to compensate the nonbreacher for the other party's failure to perform." *Market Center,* 453 B.R.
at 362-63.

-20-

punishment rather than compensation it constitutes a form of oppression sufficient to deny its enforcement.

Under *Gruschus* and *Nearburg*, to be enforceable, the $600,000 of liquidated damages under the Note must not be so extravagant or disproportionate in relation to a reasonable estimate of the anticipated damages from the triggering breaches, estimated as of the time the Note was made, that it functions as punishment rather than compensation. If it functions as a punishment, it constitutes a form of oppression sufficient to characterize it as an unenforceable penalty. *See Gruschus*, 75 N.M. at 655, 409 P.2d at 504 and *Nearburg*, 123 N.M. at 531–32, 943 P.2d at 565–66 (both discussed above). Actual loss a party may have suffered (or not suffered) is irrelevant. *Gruschus*, 409 P.2d at 655. *See also Fort Knox Self Storage, Inc.*, 140 N.M. at 240, 142 P.3d at 8 (the standard for disproportionality of a liquidated damages provision is not based on actual loss, but on the loss reasonably anticipated at the time of the contract).

WM contests whether there has been a default under paragraphs 9(c) or(d) of the Promissory Note. But even if the Court were to assume that a default under either provision has occurred, the damages resulting from the alleged defaults (*i.e.* STM's bankruptcy filing, or WM's alleged inability to pay debts as they become due) are not difficult to estimate and are so disproportion to the amount of the liquidated damages to constitute an unenforceable penalty.

Jesmer's assertion that the liquidation damages clause compensates her for anticipated attorney's fees and costs of collection in the event WM or STM filed a bankruptcy case is unavailing. Those damages are covered by other provisions of the Note. WM does not dispute that Jesmer is entitled to compensation under the separate attorneys' fees clause in the Promissory Note for her reasonable attorneys' fees incurred to collect the Note, including her reasonable attorneys' fees incurred as a result of WM's bankruptcy filings. *See* Note, ¶ 8.

-21-

Further, the Note separately compensates Jesmer for other costs of collection and for damages incurred from delayed collection by imposing interest that continues to accrue on the past due balance and a late charge of 5% of the amount due on all past due payments. Thus there would be no reason to fix a liquidated damages figure to compensate for anticipated attorneys' fees and costs necessitated by a bankruptcy filing or collection difficulties. Jesmer's claim for attorneys' fees, costs and difficulty of collection is covered by the attorneys' fee, interest and late fee provisions in the Note, not by the $600,000 liquidated damages provision.

Further, under the settlement agreement, Jesmer reduced her risk of nonpayment from WM and STM by obtaining a lien against collateral to secure payment of the Note that must at all times be insured in an amount not less than $1.3 million.

In addition, Jesmer's damages arising from nonpayment of the Note other than attorneys' fees and costs of collection (*i.e.,* failure to pay the amounts due on the schedule provided in the Note) are readily ascertainable and can be determined adding accrued interest to the unpaid principal balance. *See Market Center East*, 433 B.R. at 363 ("[W]hen a cash payment is not made it is not difficult to estimate the damage. Delay in the receipt of money is measured by interest."); *see also Checkers Eight*, 241 F.3d at 562 ("Absent exceptional circumstances, actual damages caused by monetary payments being late are not difficult to measure because interest rates can be used to estimate the time value of money.") (citations omitted).

Ordinarily, the defined default that triggers a liquidated damages provision causes the injury the liquidated damages provision is designed to compensate, such as a failure to timely complete a construction project, breach of a confidentiality provision, or defamation. *See, e.g., Louis Lyster General Contractor, Inc. v. City of Las Vegas*, 1971-NMSC-094, 83 N.M. 138, 489 P.2d 646 (1971) (liquidated damages for delay in completion of construction contract). The

-22-

liquidated damages amount must be measured against a reasonable estimate of the likely damages resulting from the default, determined as of the time the contract was made. *See Gruschus,* 75 N.M. at 655, 409 P.2d at 504 (concluding that the trial court should have enforced a liquidated damages provision where there was no evidence that the liquidated damages was an unreasonable estimate of the damages at the time of the contract). Here, neither of the defined defaults in the Note that trigger liquidated damages are likely to cause Jesmer damages (separate from the damages she is otherwise entitled to recover under the Note) that are more than a small fraction of the $600,000 liquidated damages amount.

Therefore, the $600,000 in liquidated damages is so extravagant or disproportionate in relation to a reasonable estimate of the anticipated damages stemming from defined events of default that trigger the liquidated damages provision, that it functions as punishment rather than compensation. Consequently, the $600,000 liquidated damages provision constitutes an unenforceable penalty.

C. Whether Jesmer's claim for attorneys' fees in WM's bankruptcy case has already been satisfied

WM does not dispute that Jesmer is entitled to her reasonable attorneys' fees incurred in for collecting the Note but asserts that her claim for attorneys' fees represents the same fees the Court has already allowed Jesmer in STM's bankruptcy case and that satisfy her attorneys fee claim in the WM case. To support this contention, WM relies on two orders entered in STM's bankruptcy case: 1) Order Approving Compromise Resolving Disposition of Proceeds of Sale of Asset ("Compromise Order") – Docket No. 207; and 2) Order Resolving Entitlement of Susan Jesmer to Attorney Fees ("Attorney Fee Order") – Docket No. 243. In the Compromise Order, Jesmer agreed to accept payment of $31,779.00 in full satisfaction of her claims against STM, other than her claim for attorneys' fees. Compromise Order, ¶ B. The Attorney Fee Order recites

-23-

that Ms. Jesmer produced billing statements for fees incurred between September 20, 2016 and June 30, 2017 related to STM and the Promissory Note. *See* Attorney Fee Order, ¶13. The Attorney Fee Order included the following provisions: 1) STM's "payment of $12,000 to Ms. Jesmer shall constitute full and complete satisfaction of any claim that Ms. Jesmer has against [STM] for attorneys' fees and expenses"; 2) "Ms. Jesmer will not present any portion of the billing statements heretofore produced in this matter for payment by WM Distribution, Inc." Attorney Fee Order, ¶¶ B and C.

Jesmer's WM Claim requests attorneys' fees of $68,582.98 for the period of September 2016 through March 9, 2017. *See* Claim No. 2-2 (Attachment 6). One possible inference from the Attorney Fee Order and Jesmer's WM Claim is that the attorneys' fees sought in WM's bankruptcy case duplicate the billing statements presented to STM that resulted in the Attorney Fee Order. Jesmer, however, points out that the Attorney Fee Order only limited Jesmer from seeking fees for payment that had already been presented for payment in the STM bankruptcy case and compromised Jesmer's claims only with respect to STM. Because the none of the billing statements are currently before the Court, the Court cannot determine for from the evidence before it whether the attorneys' fees Jesmer included in her WM Claim are the same fees she compromised in the STM bankruptcy case.

CONCLUSION

The facts not subject to material dispute establish as a matter of law that the $600,000 default damages amount is an unenforceable penalty. Such amount is so extravagant or disproportionate to the damages Jesmer would suffer from a default triggering the liquidated damages provision that it functions as a punishment rather than compensation. However, facts not in material dispute fail to establish whether Jesmer is entitled to the attorneys' fees

-24-

component of her claim. The Court will, therefore, deny summary judgment with respect to the attorneys' fees included in Jesmer's claim. The Court will enter a separate order consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: June 29, 2018

COPY TO:

Michael K Daniels
Attorney for Debtor
PO Box 1640
Albuquerque, NM 87103-1640

Joel Gaffney
William F. Davis
Attorney for Sandia Tobacco Manufacturers, Inc.
6709 Academy NE, Suite A
Albuquerque, NM 87109

Dylan O'Reilly
Miller Stratvert P.A.
Attorney for Susan Jesmer d/b/a Native Trading Associates
PO Box 1986
Santa Fe, NM 87504-1986